I see we've lost most of our spectators. But we will move on to the second case for today, which is United States v. Allen Young. Mr. Kelleher. Good morning, Your Honors. Christopher Kelleher for Allen Young. This appeal presents a number of issues. I'm happy to answer questions on any of them, but will try, with the Court's indulgence, to focus my remarks on three. The continuance denial, the search of Mr. Young's home, and the sufficiency of the evidence. The continuance denial set the trial's tone by putting Young at a distinct disadvantage. Any history of Young gaming the system? None. This was his first continuance as a pro se litigant. Well, as a pro se litigant, but he had three weeks, even so, to review his materials, and I thought the government went to some trouble to make sure that he had copies of everything he needed, and so on. Your Honor, Mr. Young had difficulty receiving materials through the MCC, and there's evidence of that in the record, docket entry 156. In fact, he didn't get some materials from his investigator until the trial. So that factor definitely weighs towards continuance. But is there any rule that says when somebody's, excuse me, go ahead, Judge Rovner. You know, this is one of the downsides to firing your counsel right before trial. By Judge Chang's view, this was the third continuance with being requested. And a trial, it's very difficult for trial judges who have put aside this kind of time. Very difficult. Understood, Your Honor, and I recognize that it's not as simple as just moving some dates around. I recognize that a lot of things have to shift. But what I would point out here is that the two prior continuances, one, the first one was obviously by counsel, and that was because the prosecution had changed the indictment, and the district court had still yet to rule on some 412 evidence. The second continuance was due to a family emergency of counsel. And then thirdly, his desire to go pro se, as was ultimately demonstrated, was not a ruse. Mr. Young had difficulty with his counsel, and I believe the catalyst for that was his failure to file a suppression motion for the evidence of the notebooks. So there was a real disagreement between counsel and client here. And I recognize that the court's docket is important, but as is the constitutional right to a meaningful defense and the right to a fair trial. And with due respect to the district court, its rationale for the denial here is thin. The opening brief dismantles the three cases that the district court relied on. But the district court has discretion to manage the docket. I'm not familiar with any rule in the Ferretta context that says, you know, the clock for continuances and all of that starts the moment the person definitively exercises his or her right to self-representation. I mean, as Judge Rovner said, it's one of the risks, and this wasn't the night before trial or anything. And the judge may well have actually taken some exception to that. It upsets the entire schedule. There were witnesses there who, he points out, were going to have a difficult time with this trial, the minor victims. There was a lot that seems to me would, within the realm of rational decision-making, maybe every judge wouldn't have done this, but within the realm of rational decision-making would have said, let's go ahead. Just get it done in the three weeks you have. Certainly, Your Honor. And I would also point out that affirming on this issue, it would break new ground here. For the fact that the cases, because the cases in this circuit that affirm a continuance denial, the facts are not as favorable as they are here. If you look at Volpentesta, the court actually granted a continuance of 21 days. That's one of the cases the district court relies on. In the Jackson case, the continuance was requested two days before trial. The Sheshnow case, it was four continuances, and the fifth was made the morning of trial. The district court has such broad discretion here. The district court is the one who is sitting there and who can balance the equities. It's a pretty steep climb for us to reverse something like that. And I recognize it's an abuse of discretion, and I recognize that there is some leeway to the district court. I would just merely point out that this discretion obviously is not unfettered and that a court may not proceed with a myopic insistence on expeditiousness. And that's obviously not my words. Those are the Supreme Court's words in UNGAR. Recognizing the court's resistance to this issue, I will move to the Fourth Amendment issue, which is the search of the notebooks, which uncovered the notebooks. As the court knows, the Fourth Amendment protections are at their strongest when a home is involved. It's also undisputed that a subluxer can't consent to the search of his tenant's residence. But the facts of this case suggest that it's maybe more accurate to say, or at least one could think, that Mr. Harris and Mr. Young were co-occupants of this apartment. They weren't roommates. Apparently Mr. Harris was staying with his child. But all of his things are there. He's in and out. He has a key. Young knows this. So if the police reasonably could have thought that he was just a co-occupant, then we don't have something that's such a strict landlord-tenant arrangement. I recognize the facts are a little opaque in some ways in the sense that we don't know exactly what transpired. Do we know how the police approached Harris, by the way? Did they just go and knock on the door? What did they do? They called him. And I'm not sure how they got his contact information, but they called Mr. Harris. They found his name somehow. Right. And they met him outside again. And that's one factor that we would point out. And Mr. Harris, we can glean from the record, it appears Mr. Harris told the agents he didn't live there. And that's the fact. And I recognize that he has keys, as do tens of thousands of landlords and subluxers. But if keys equal consent, the Fourth Amendment's a dead letter. And Mr. Harris told agents he didn't live there. And true, he did have his materials there, his belongings, I should say. But this was a studio apartment. And this fact, in my mind, that cuts against this search. What if it had been a storage locker? A storage locker that's essentially co-owned. I think there the argument would be stronger for the prosecution. But this is a studio apartment where Mr. Young is living and Mr. Harris is not living. So that factor, that should have tipped off officers, especially because it's a studio. There's essentially one bedroom and the notebooks are found on the bed, which obviously would have been where presumably Mr. Young was sleeping. So that factor, again, we would argue favors suppression. Can you talk about the timeliness point? The timeliness of his suppression motion? Certainly, Your Honor. It's definitely a weak spot in our position. I would point out that, as I mentioned previously, the catalyst for the firing of counsel was this suppression motion, or I should say the failure to file this motion. Mr. Harris, excuse me, Mr. Young was scrambling pre-trial. Obviously he only had three weeks. He did file a few other motions, but essentially he did not timely file the motion, admittedly. The record is a little unclear because at transcript, I believe, 930, the district court recognizes that Mr. Young had raised the issue of suppression previously. And I'm not sure if Judge Chang is referring to pre-trial or something of that nature during trial. So Mr. Young did not timely raise it in terms of Judge Chang's scheduling, but he did at least object to it and raise the issue. So we would argue at least it's preserved, if not plain error. Well, so here's the problem. As you know, Rule 12 of the Rules of Criminal Procedure, which was revised to focus very carefully on what's waived, what's forfeited, and so on, 12B3C lists a suppression motion as one that must be raised by pre-trial motion if the basis is then reasonably available. That certainly was true. And there's the good cause requirement, the consequences of not making a timely motion under C. But I wasn't aware that he made the argument to show good cause even for the district court. You're now saying that it was the breakdown in the attorney-client relationship. But where's that in the record? Frankly, Your Honor, it's not, or at least it's not very clear. I do know that in some of the post-trial motions, he filed 21 of them, there is reference to the fact that he wasn't able. I believe it's docket 196. He does raise the argument that he was unable. He had wanted to raise this argument, but he was unable to because of counsel. And I reference that in the brief again. But wasn't he writing things to the court? I mean, he says he's unable to because of counsel. But what made him unable once he takes over his defense three weeks before trial? Well, I'm not sure exactly. I mean, he knew all about Harris at that point. Right. I'm not sure exactly what precluded him, but I will again point out the fact that docket entry 156, the court and the MCC to its credit, I don't see this very often, the MCC acknowledges. We dropped the ball. He didn't get some of his materials. But did he file anything from the time? Yeah, he filed things from the time. Yes, he did, Your Honor. He did, I believe three or four months. Just not this, yeah. Certainly. So, again, I would point out the fact that he's overwhelmed. There's three weeks here, and he's obviously doing this from the confines of the MCC. Moving on to the sufficiency of the evidence, I'm not here to portray Mr. Young in a benign light. He engages in illicit and illegal relationships with minors in violation of state law. But this doesn't meet the elements. Savory as his conduct is, it doesn't meet the elements of a federal defense. So you're focusing mostly on the interstate commerce point? Yes, Your Honor, along with count five, which concerns Alexis. And that is the attempted trafficking of Alexis. And there the evidence is very clear that Mr. Young did not post a back page ad for her, provide her with condoms, drive her anyplace, rent a hotel. So on that basis alone, he didn't do anything implicating interstate commerce. He did take her to an out call, which was in response to a call he received for multiple girls. Her prostitution that night was therefore, it would seem to me, a result of a back page advertisement, even though she herself was not advertised in the back page ad. Judge Roldner, I don't think the evidence, or I should say the record is clear on that point. All we have is the testimony from Gianna. And she's actually the one who prompts Alexis to go with her on this call. There's no communication between Mr. Young and Alexis. She testifies. Well, this is when she sees the back of his head, but he knows she's in the car. I mean, he's taking her for the business purpose identified. If we assume that Gianna's testifying correctly, and that's what Gianna said. But Alexis did say that Young did not ask for anything, didn't ask for money. The jury believed her. The jury believed her. So it's so uphill for you. It is, Your Honor. It is. And I recognize that. Again, I would just stress the – getting business from that isn't enough, actually pretty easily, to show interstate commerce. What's more interstate commerce than an Internet website and posting? Well, a couple reasons. Firstly, there's essentially no precedent, at least in this court, for an Internet posting standing alone to satisfy interstate commerce. For this statute. But there are other statutes where we've said that. True. True, Your Honor. But really common sense. I mean, isn't the Internet everywhere? Well, and that's true, but that's the problem, is that anything can become interstate commerce. The framers didn't anticipate the Internet. We can be confident. They didn't. I can't believe they didn't. They'd be horrified, probably. But interstate commerce, the concept is not merely eroded. It's rendered meaningless. And another point I would make is that – But you don't have to put your ads on Backpage. You could have, you know, word-of-mouth networks. You could – I mean, there are other ways, even though we do basically live on it. Certainly. But I would also point out that these are local ads, that this is a Chicago-based ad. So it's obviously geographic, based on geographic, local geographics, I should say. So that's another point, that if he was posting ads in Illinois, excuse me, Indiana, Wisconsin, other states, then it would make more sense. But here it's a Chicago-based ad. So I would argue that point as well. Okay. I'll reserve the balance. If you'd like to reserve time, that's fine. Thank you very much, Mr. Kelleher. Ms. O'Neill. May it please the Court, Christine O'Neill on behalf of the United States. Can I start you out with this interstate commerce? I don't understand why the government didn't just, you know, get some information from the hotel, for example, about how many guests over the course of a year had out-of-state credit card billing, you know, addresses or something. I mean, the government does this all the time. So why not? And if I might add to that, why you just didn't go where Trojan condoms are manufactured. It took five seconds to find out where they are. Judge Rofner is always very thorough. Are you going to tell us? No, but seriously, this was not a high burden. And the district court commented, and I understand why he said this, it was a much closer call than it had to be. Yes, Your Honor. The district court did say it was a closer call on those other two parts of the interstate commerce proof, while still finding that the Internet and back page ads alone were sufficient to meet the burden here. The government did present testimony on the hotel rooms. A law enforcement officer explained that he went online and he could book hotel rooms out of state. That doesn't tell us whether anyone did. I mean, I would actually be astonished, given where this hotel is located, if there were not out-of-state visitors there. But you can't just say, I could go on the Internet and book a room. Maybe nobody ever does. I mean, there's data. There's a fact that you could prove. That's correct, Your Honor. There isn't a good answer in the record about why that information was not subpoenaed. Maybe it would be a good idea to have one less problem unappealed in the future. Certainly, Your Honor. As Your Honor has stated, the district court did find that even without what it viewed as compelling evidence for the hotel room aspect and the condom aspect, that the Internet was sufficient to meet the interstate commerce element, because at the core of the defendant's trafficking enterprise were these back page ads and other websites used to provide the minors to others for commercial sex. So does U.S. v. Campbell definitively resolve that Internet ads alone are a sufficient nexus to interstate commerce? It did not, Your Honor. It left open that question because there was other, better developed evidence about phone usage in that case. And so this court left that part of the inquiry open there, saying the Internet was part of the decision, but not the only basis in that case. I think the serious point to make here is if you actually believe in federalism and you think there should be some things that are within Congress's interstate commerce power and some things that are not, which was the theme of the Supreme Court's decision many years ago in Lopez, by the time we say the usage of the Internet is enough for interstate commerce, you've really erased any limitation on federal authority, Congress's authority to pass a statute, federal authority to prosecute. I think I understand what Your Honor is saying as taking up the point from defense counsel, which is that isn't everything interstate commerce now? We're all using the Internet all the time. I would say in this particular case, just like in Horn, the advertisements that are being placed on the Internet are actually creating commerce. The defendant here is posting these girls to be sold over the Internet. They create interstate transactions that are central to the offense. And so like in Horn, this is not a de minimis use of the Internet that we had here in this case. Could you say a word about good cause with respect to Harris allowing the search of the apartment unit? It's certainly clear that he doesn't, as the rule requires, raise the suppression motion pre-trial, but that's not insurmountable under the rule. The rule allows a late filed motion if there's good cause. Yes, Your Honor. And even now, there hasn't been good cause that's been stated for the delay. As Your Honor pointed out, once the defendant went pro se, if this dispute about the suppression motion was in fact the reason for firing his counsel, which is not in the record, Your Honor, but if it was, once defendant went pro se, he had three weeks during which he filed numerous other pro se motions. And significantly here, Your Honor, the notebooks were on the government's witness list, which the district court—excuse me, exhibit list. I was going to say. They were not witnesses at the trial. The district court required that the exhibit list be filed November 6, 2017, so several months before the first trial date and about four months before—excuse me, about six months before the case ultimately went to trial. So defendant had ample notice that these exhibits were going to be introduced by the government, but it was not until at sidebar, once Charlie Harris took the stand, that the defendant raised this issue. You know, I am troubled by the search of Harris' apartment. It sounds like he—well, Harris didn't sleep there. Young paid him rent. Was this a landlord-tenant situation? I mean, I realize that there's a harmless error argument here, but I am wondering about the reasonableness of the search. Did the police know that Young was paying Harris rent? So, Your Honor, there is very little in the record about what the police knew at the time of the search. I would like to clear up one thing that came up while opposing counsel was standing up here. He stated that Harris told agents he did not live there. That is not in the record, and if the court would like additional information about that exchange,  the facts there actually weigh in the government's favor. The exchange outside the apartment, when Harris showed up with a key to open this door, was he explained that he had a relationship with Young that always allowed Harris access to the apartment. So where's the source of what you're now telling us? So there is a 302 about the statements that Harris made to law enforcement outside the apartment. It was never introduced into evidence. That's correct. So would we want to supplement the record with that? It seems a little irregular to rely on something that's not in the record. Yeah. Yes, and certainly I wanted to clarify that point about what's in the record and what's not. So what it was actually in front of the district court for purposes of making this decision was that the TFO who performed the search testified at trial that he went there, got signed consent from Harris, that Harris had a key, and that he was the leaseholder of the apartment. That's all we know about what was in the minds of the searching officers in terms of determining whether they had apparent authority. So Harris himself is a tenant, and Young is a subtenant. Is that right? Something like that, Your Honor. Getting back to answer your question and Judge Rovner's about the rent, that is sort of in the record and sort of not in the record. The defendant raised it at sidebar as part of his own representation, but it was not a sworn statement. It wasn't part of the evidence in this case, and it's not something that the district court considered when making its decision about who had authority to consent to search. What about the timeliness under Rule 12 of his objection to the introduction of the evidence and the suppression motion for the notebooks? Correct. It was untimely, and defendant, again, has not yet stated good cause for that untimeliness, which makes the analysis here clear error. Clear error or plain error? I believe it's clear error, but it's possible I have that misstated, Your Honor. Okay. Because before the amendment, Rule 12 used to say that if you don't make one of the motions in that list of pretrial motions, it was waived, used that word, and then it said, but you can overcome the waiver if you have good cause, and the Rules Committee spent a lot of time trying to find the right word for it, because waiver by this time, when the rule had been written, Olano hadn't been decided. Waiver didn't seem to be the right concept because good cause can't overcome a real waiver, so the rule is rewritten as it is. But then you have the district court's discretion to take it up late on the good cause standard, and then you have an appellate standard of review to worry about also. I understand, Your Honor, and I think the point here is that because of the late-raised claim, there was no opportunity to develop the record. So that's why this is such an unsatisfactory record. That's correct. The limited record that does exist suggests that there is not a basis to overturn the district court's decision. All right. Turning to the continuance, Your Honor, unless there's somewhere else that the panel would like me to go. After two continuances of the trial date in this case, the district court acted within its discretion, denying the defendant's request for an open-ended continuance of the trial. As Judge Rovner stated, there is a downside to firing your counsel three weeks before trial, and defendant's decision to proceed pro se came after months of delay and discussion regarding his choice of counsel. Was this his first effort to go pro se? Not exactly, Your Honor. If you look at the record, there are pro se filings on the docket from the defendant in December, January, March, and April. So there was this kind of back and forth that was going on between him and his attorneys, particularly around the time of the second continuance in February. When the defendant finally decided to proceed pro se, it was less than a month before the trial date, and the district court went to great lengths to make the risks of self-representation clear and, as you pointed out, Judge Wood, to go to additional lengths to make sure that the defendant would be able to prepare. I'd like to clear up specifically this issue of the discovery. Was the defendant in the MCC? He was. At the April 24th hearing where defendant decided to go pro se, his former attorney, who stayed on as standby counsel, put some representations on the record about the fact that most of the discovery had been provided to the defendant at that point in paper form. There were some limited exceptions, voluminous phone records that were provided on a disc that understandably are more difficult to review at the MCC. And in abundance of caution, the government produced a new set of discovery to defendant, and that is what was delayed in getting to him. So there's nothing in the record that says he didn't have the bulk of the discovery, and as to the specifics of those phone records, which defendant takes up in his reply brief, they were voluminous. They were difficult to review at the MCC. Again, the government had identified as of November which portions of those records it would be introducing at trial, and so defendant was on notice about what the evidence would be. Is there a capacity at the MCC to review, let's say, in the library, things that are on a disc or a thumb drive? There is, Your Honor, and the district court ordered that defendant have essentially unlimited access to the law library in the weeks leading up to trial so that he could do that. The court fairly resolved these different concerns by denying the continuance while making these accommodations for the defendant, and even now the defendant doesn't cite anything that he would have done differently if he had been given additional time. As the district court points out, he had a good command of the facts at trial. He seemed to have a good handle on the exhibits, the discovery, and there simply was not any prejudice here to denial of the continuance. If there are no other questions, Your Honors, the government asks that the court affirm the ruling of the trial judge in this case. All right. Thank you very much. Mr. Kelleher. Thank you, Your Honor. If I can take up where counsel left off, 30 days wouldn't have turned Alan Young into Clarence Darrell, but it would have given him some breathing room, time to meet with standby counsel to review the discovery, to craft a better defense. The continuance denial decimated Young's defense. The trial was a rout. He didn't stand a chance. He stumbled when he had multiple opportunities to impeach witnesses, and obviously as the court recognizes, he didn't adequately argue the suppression issue. As for the record on that point, again, I concur with counsel that the record is opaque, but I would point the court to docket entry 196 at 2 to 3, and I recognize that's a post-trial motion, but unfortunately that's the best I can do at this point, and that is where Mr. Young discusses briefly the situation with Mr. Harris. I would also point to transcript pages 913 to 914, in which Mr. Harris testifies about his living situation, and I recognize that was trial testimony, but at least it gives some background as to what the living situation was. I have a couple minutes, if I can briefly address the expert testimony of Ms. Lando. Ms. Lando essentially testifies to jurors that sex trafficking is bad, that victims are victimized, and that prostitution hurts minors. These are the highly complex and technical concepts laypersons supposedly don't understand. But doesn't she spend some time talking about typical techniques of sex traffickers, and I don't know that jurors necessarily would know the approaches or tools of the trade. Well, Your Honor, essentially in this case, and again this is I think an odd case from the sex trafficking point of view. Your Honors are very familiar with Carson, I know. This was not a case where the trafficker used severe violence or psychological tactics. He didn't tether these minors through shelter, money, or drugs. This was simply very basics. They would call sometimes, and they would get together, and he would take them. So this wasn't a very complex situation, and the testimony here really didn't need to address any complexities because there was none. In Carson, as Your Honors are aware, that was a much different situation. There the trafficker used brutal rapes, beatings, threats of murder. He dulled the minors with heroin. So in that case, the issue was why were these minors, why were these victims continuing to stay with the trafficker? But maybe there's a greater need for testimony if you don't see such evident abuse. It strikes me that the jury would want to know that this kind of psychological game can happen too. Certainly, Your Honor, but I would point out here that these minors, they left young when they wanted to. They would come and go as they pleased, and there was nothing keeping them other than just abuse. I mean, you have to, that's what, what do you mean they could come and go? I mean, they're minors. They're children. I recognize that, Your Honor. And I'm not, again, I'm not trying to portray Mr. Young in a benign light, but I'm just trying to provide context. As Your Honors are aware, the Carson case, I mean, that's an example, or even Campbell where the minors were, excuse me, the victims were branded with tattoos. So the violence in those cases, the abuse, the coercion, those dynamics are simply absent here. I mean, that could be a sentencing factor, it seems to me, but it doesn't really address whether the crime has been committed. Well, this disconcerns the expert. I mean, there's no, well, but if the expert is testifying as to how he, how the sex trafficking business operates in some instances without rape and drugs and whatever, confinement, that's something that might assist the jury in understanding in a situation, as you've portrayed it, where somebody's 16 years old or so and comes and goes, how that's still sex trafficking. Well, Your Honor, and I respect that. I would just simply point out that this is common knowledge, I would think, that someone, as Judge Rovner points out, someone young, someone 14, 15, 16 years old, is simply not going to understand, not have the abilities to make those decisions themselves. I don't think you need an expert with all the aura of respectability that a special agent has. I think that it's just too much credibility, lends too much credence to this position and essentially bolsters the testimony of the victims. So, again, I recognize the record is what it is, and there are no further questions. Thank you for your time. Well, thank you, and we thank you very much for accepting the appointment in this case. It's of great help to the court. Thanks. And thanks as well to the government. We'll take the case under advisement.